## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

**WEST VIRGINIA HIGHLANDS CONSERVANCY,**

    **Post Office Box 306**
    **Charleston, West Virginia 25321**

      **Plaintiff;**

          **v.**

**UNITED STATES FOREST SERVICE,**

      **Defendant.**

**Civil Action No. 1:21-cv-02079**

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

This is an action under the Freedom of Information Act (the Act), 5 U.S.C. § 552, challenging the United States Forest Service's refusal to provide the West Virginia Highlands Conservancy (the Conservancy) with public records regarding the development and implementation of the Service's Gauley Healthy Forest Restoration Project (GHFR Project or the Project). The Conservancy respectfully requests a declaration of its rights under the Act and an order (1) requiring the Service to conduct an appropriate search for records responsive to both requests; (2) enjoining the Service from withholding any reasonably segregable, non-exempt information identified in that search; and (3) awarding Plaintiff any reasonable attorney fees and litigation expenses incurred in asserting their rights under the Act.

## JURISDICTION & VENUE

1.  This Court has jurisdiction to award declaratory and injunctive relief under Section 552(a)(4)(B) of the Act, 5 U.S.C. § 552(a)(4)(B), and under the Declaratory Judgment Act, 28 U.S.C. §§ 2201–2202.

2.  Venue is proper in this Court under Section 552(a)(4)(B) of the Act, 5 U.S.C. § 552(a)(4)(B), which "expressly establishe[s] the District of Columbia as a place of proper venue in all FOIA cases." *In re Scott*, 709 F.2d 717, 722 (D.C. Cir. 1983).

## PARTIES

3.  Plaintiff West Virginia Highlands Conservancy is a non-profit West Virginia corporation dedicated to the promotion, conservation (including both preservation and wise management), and appreciation of West Virginia's natural resources. The Conservancy has approximately 1500 members interested in protecting the state's wilderness and its other areas of recreational, scenic, geologic, biologic, or historic importance.

4.  The Conservancy is a member of the Allegheny–Blue Ridge Alliance (ABRA), a non-profit Virginia corporation organized to promote and protect the environmental, recreational, and scenic value of the Allegheny–Blue Ridge region. In accordance with their shared institutional interests, both the Conservancy and ABRA are interested in projects affecting the Monongahela National Forest, including the Gauley Healthy Forest Restoration Project (the GHFR Project) proposed by the United States Forest Service.

5.  Defendant United States Forest Service is a component of the United States Department of Agriculture and an agency of the federal government. The Service is headquartered at 1400

Independence Avenue Southwest, Washington, District of Columbia. The Service possesses, has custody over, and controls the records at issue in this case.

## LEGAL FRAMEWORK

*The Freedom of Information Act*

6.  Designed to "pierce the veil of administrative secrecy and to open agency action to the light of scrutiny," *Department of the Air Force v. Rose*, 425 U.S. 352, 361 (1976), the Freedom of Information Act generally requires that federal agencies promptly disclose records within their possession upon request, 5 U.S.C. § 552(a)–(b).

7.  Upon receiving a request for records under the Act, an agency must conduct a search reasonably calculated to locate all records responsive to that request. *Id.* § 552(a)(3)(C)–(D). The Act requires a "systematic approach to locating the requested records," *Skurow v. Department of Homeland Security*, 892 F. Supp. 2d 319, 327 (D.D.C. 2012), using methods "reasonably calculated to uncover all relevant documents," *Weisberg v. Department of Justice*, 705 F.2d 1344, 1351 (D.C. Cir. 1983); *see also Oglesby v. Department of the Army*, 920 F.2d 57, 68 (D.C. Cir. 1990) (holding that an "agency cannot limit its search to only one record system if there are others that are likely to turn up the information requested").

8.  While an agency's search is generally "measured by the reasonableness of the effort in light of the specific request," *Larson v. Department of State*, 565 F.3d 857, 869 (D.C. Cir. 2009), an agency "ha[s] a duty to construe [that] request[ ] liberally," *Yagman v. Pompeo*, 868 F.3d 1075, 1079 (9th Cir. 2017). Moreover, the reasonableness of a search is measured by "what the agency knew at its conclusion rather than what the agency speculated at its inception,"

*Campbell v. Department of Justice*, 164 F.3d 20, 28 (D.C. Cir. 1998). As such, an agency must "revise its assessment of what is 'reasonable' in a particular case to account for leads that emerge during its inquiry." *Campbell v. Department of Justice*, 164 F.3d 20, 28 (D.C. Cir. 1998); *see also Hall v. Central Intelligence Agency*, 881 F. Supp. 2d 38, 61–62 (D.D.C. 2012) (holding that where agency "has provided [requester] with documents that reference other specific responsive records that have not been produced," it "is no longer 'mere speculation' that the files exist.").

9.  An agency generally has twenty business days after receiving a request to "determine . . . whether to comply with [the] request and [to] immediately notify" the requester of, among other things, the reasons underlying its determination. 5 U.S.C. § 552(a)(6)(A)(i). In order to qualify as a valid response under the Act, that notice must "communicate the scope of the documents [the agency] intends to produce and withhold, and the reasons for withholding any documents," as well as the requester's right to appeal "whatever portion of the [agency's] 'determination' is adverse." *Citizens for Responsibility & Ethics in Washington v. Federal Election Commission*, 711 F.3d 180, 187 (D.C. Cir. 2013). The agency's response must "provide enough information, presented with sufficient detail, clarity, and verification, so that the requester can fairly determine what has not been produced and 'the reasons therefore.'" *Fiduccia v. Department of Justice*, 185 F.3d 1035, 1043 (9th Cir. 1999).

10. The Act allows an agency to extend the twenty-day deadline by ten working days in "unusual circumstances," defined narrowly as the need (a) to collect responsive records from separate offices; (b) to search for, collect, and examine a voluminous amount of responsive records; or (c) to consult with another agency or administrative component with a substantial interest in

the subject matter of the request. 5 U.S.C. § 552(a)(6)(B)(iii). In any case, the agency must provide the requester with a written notice explaining the "unusual circumstances" that justify an extension. *Id.* § 552(a)(6)(B)(i).

11. An agency may withhold records or portions of records uncovered in its search only if they fall within one of the nine statutory exemptions set forth in Section 552(b) of the Act, 5 U.S.C. § 552(b). Those exemptions, however, are "explicitly made exclusive" and must be "given a narrow compass." *Milner v. Department of the Navy*, 562 U.S. 562, 565, 571 (2011). Given the Act's "strong presumption in favor of disclosure," *Department of State v. Ray*, 502 U.S. 164, 173 (1991), an agency bears the burden of demonstrating the applicability of any statutory exemption, 5 U.S.C. § 552(a)(4)(B).

12. Moreover, the Act's exemptions "do not apply wholesale," and any information exempt from mandatory disclosure "does not insulate from disclosure the entire file in which it is contained, or even the entire page on which it appears." *Arieff v. Department of the Navy*, 712 F.2d 1462, 1466 (D.C. Cir. 1983). As such, an agency responding to a request for records has a statutory duty to "consider whether partial disclosure of information is possible" and to "take reasonable steps necessary to segregate and release nonexempt information." 5 U.S.C. § 552(a)(8)(ii). The Act's mandate to "construe the exemptions narrowly with the emphasis on disclosure" applies also "[i]n determining segregability." *Davin v. Department of Justice*, 60 F.3d 1043, 1052 (3d Cir. 1995).

*Exemption Five: The Deliberative Process Privilege*

13. One of the Act's "narrow" exceptions to disclosure—commonly referred to as "Exemption Five"—allows agencies to withhold "inter-agency or intra-agency memorandums or letters which would not be available by law to a party other than an agency in litigation with the agency." 5 U.S.C. § 552(b)(5). To qualify under Exemption Five, material must "satisfy two conditions: its source must be a Government agency, and it must fall within the ambit of a privilege against discovery under judicial standards that would govern litigation against the agency that holds it." *Department of the Interior v. Klamath Water Users Protective Association*, 532 U.S. 1, 8 (2001). Accordingly, any "correspondence with an outside party [or] 'external memoranda' that have either been disclosed to individuals outside the agency or were created by third parties and provided to the agency . . . do not fall within the ambit" of the Exemption. *Levy v. Postal Service*, 567 F. Supp. 2d 162, 167 (D.D.C. 2008) (citing *Mead Data Central v. Department of the Air Force*, 566 F.2d 242, 257 (D.C. Cir. 1977)).

14. Exemption Five's second element incorporates a "deliberative process privilege" developed through the common law to "protect[ ] 'the decision making process of government agencies.'" *National Labor Relations Board v. Sears Roebuck & Co.*, 421 U.S. 132, 150 (1975) (quoting *Tennessean Newspapers v. Federal Housing Administration*, 464 F.2d 657, 660 (6th Cir. 1972)). The deliberative process privilege generally "shields 'documents reflecting advisory opinions, recommendations and deliberations comprising part of a process by which governmental decisions and policies are formulated.'" *Trentadue v. Integrity Committee*, 501 F. 3d 1215, 1226 (10th Cir. 2007) (quoting *Klamath Water Users*, 532 U.S. at 8). The privilege, however, "is a very narrow and qualified one," *Doe v. Nebraska*, 788 F. Supp. 2d

975, 984 (D. Neb. 2011), and the case law specifically "identifie[s] two prerequisites to [its] assertion," *Senate of Puerto Rico v. Department of Justice*, 823 F.2d 574, 585 (D.C. Cir. 1987). To successfully invoke the privilege, an agency bears the burden of demonstrating that the information it withholds is "both 'predecisional' and 'deliberative.'" *Petroleum Information Corp. v. Department of Interior*, 976 F.2d 1429, 1434 (D.C. Cir. 1992).

(a) Information is predecisional if it "precedes, in temporal sequence, the 'decision' to which it relates," *Senate of Puerto Rico*, 823 F.2d at 585, and was specifically "prepared in order to assist an agency decisionmaker in arriving at his decision," *Heffernan v. Azar*, 317 F. Supp. 3d 94, 118 (D.D.C. 2018). By contrast, "communications or documents that simply 'promulgate or implement an established policy of an agency' are not predecisional." *BuzzFeed v. Department of Justice*, 419 F. Supp. 3d 69, 76 (D.D.C. 2019) (quoting *Brinton v. Department of State*, 636 F.2d 600, 605 (D.C. Cir. 1980), *certiorari denied*, 452 U.S. 905 (1981)).

(b) A document is deliberative only to the extent it "involves the weighing of arguments for and against various outcomes," *Ascom Hasler Mailing Systems v. Postal Service*, 267 F.R.D. 1, 3 (D.D.C. 2010), or otherwise "reflects the give-and-take of the consultative process," *Coastal States Gas v. Department of Energy*, 617 F.2d 854, 866 (D.C. Cir. 1980). Stated otherwise, the privilege protects only "the ideas and theories which go into the making of law." *Arthur Andersen & Co. v. Internal Revenue Service*, 679 F.2d 254, 258 (D.C. Cir. 1982) (quoting *Sterling Drug v. Federal Trade Commission*, 450 F.2d 698, 708 (D.C. Cir. 1971)). Materials are not deliberative merely because they "'assist,' 'lead to,' or 'form the basis for' some governmental policy." *Allocco*

*Recycling v. Doherty*, 220 F.R.D. 407, 413 (S.D.N.Y. 2004). Rather, "the key question

. . . is whether the disclosure of materials would expose an agency's decisionmaking

process in such a way as to discourage candid discussion within the agency and

thereby undermine the agency's ability to perform its functions." *Electronic Frontier

Foundation v. Department of Justice*, 890 F. Supp. 2d 35, 44 (D.D.C. 2012) (quoting

*Horowitz v. Peace Corps*, 428 F.3d 271, 276 (D.C. Cir. 2005), *certiorari denied*, 547 U.S.

1041 (2006)) (internal alterations omitted). Only information "that actually reflect[s]

advisory opinions, recommendations and deliberations" is protected. *Allocco

Recycling*, 220 F.R.D. at 413 (quoting *Klamath Water Users*, 532 U.S. at 8).

*Administrative Appeals*

15. If an agency withholds responsive records under a claim of exemption, the requester has a

statutory right to appeal that decision to the head of the agency. 5 U.S.C.

§ 552(a)(6)(A)(i)(III)(aa). Generally, an agency must make a final determination with respect

to any administrative appeal within twenty working days. *Id.* § 552(a)(6)(A)(ii). Section

552(a)(6)(B) of the Act allows an agency to extend the time limit for responding to an appeal

by no more than ten working days in statutorily defined "unusual circumstances." *Id.*

§ 552(a)(6)(B). Aside from those circumstances, an agency may toll the twenty-day limit only

while awaiting "information that it has reasonably requested from the requester," *id.*

§ 552(a)(6)(A)(ii)(I), or as "necessary to clarify with the requester issues regarding fee[s],"

*id.* § 552(a)(6)(A)(ii)(II).

*Assignments of Rights Under the Act*

16. Like many other statutory rights, a requester's rights under the Act can be assigned to another party in certain circumstances. *See generally National Security Counselors v. Central Intelligence Agency*, 960 F. Supp. 2d 101, 137–48 & n.15 (D.D.C. 2013) (*National Security Counselors II*). A nonprofit organization may assign its rights as a requester to a partnering organization with shared personnel and similar institutional interests. *Id.*; *National Security Counselors v. Central Intelligence Agency*, 898 F. Supp. 2d 233, 257–58 (D.D.C. 2012) (*National Security Counselors I*). An assignment of rights under the Act may occur during the pendency of an administrative appeal, *National Security Counselors II*, 960 F. Supp. 2d at 147, and is generally effectuated through a "notarized statement from the original requester that specifically identifies the assignee and the rights assigned." *National Security Counselors I*, 898 F. Supp. 2d at 258. An agency that "refuse[s] to recognize a valid assignment of rights attached to a FOIA request" thereby "fail[s] to abide by the terms of the [Act]." *National Security Counselors II*, 960 F. Supp. 2d at 138.

*Judicial Review*

17. Section 552(a)(4)(B) of the Act grants federal district courts "jurisdiction to enjoin the agency from withholding agency records and to order the production of any agency records improperly withheld from the complainant." 5 U.S.C. § 552(a)(4)(B). In a suit under the Act, "the burden is 'on the agency to sustain its action,' and the district court must 'determine the matter *de novo.*'" *DiBacco v. United States Army*, 795 F.3d 178, 184 (D.C. Cir. 2015) (quoting 5 U.S.C. § 552(a)(4)(B)).

18. In order to give the agency "an opportunity to exercise its discretion and expertise on the matter and to make a factual record to support its decision," courts generally require a requester exhaust administrative remedies "before filing suit in federal court." *Hidalgo v. Federal Bureau of Investigation*, 344 F.3d 1256, 1258 (D.C. Cir. 2003) (quoting *Oglesby,* 920 F.2d at 61). However, where an agency has failed to observe the time limits prescribed by the Act, the requester is automatically "deemed to have exhausted his administrative remedies." 5 U.S.C. § 552(a)(6)(C)(i).

19. An entity that did not originally submit a request for records nonetheless has statutory standing to assert a claim under the Act if it is a valid assignee of the original requester's rights. *National Security Counselors I*, 898 F. Supp. 2d at 259.

20. Section 552(a)(4)(E)(i) of the Act allows a reviewing court to assess "reasonable attorney fees and other litigation costs reasonably incurred in any case . . . in which the complainant has substantially prevailed." For purposes of the Act, a requester "substantially prevails" by "obtain[ing] relief through either a judicial order, or an enforceable written agreement or consent decree; or a voluntary or unilateral change in position by the agency," provided the underlying "claim is not insubstantial." 5 U.S.C. § 552(a)(4)(E)(ii)(I)–(II).

## STATEMENT OF FACTS

*Contextual Background*

21. The documents at issue in this case relate to the proposed Gauley Healthy Forest Restoration Project within the Monongahela National Forest. As described in Service publications, the Project aims to make stands within the Forest more resilient to insects, disease, and fire by,

among other things, harvesting timber, applying herbicides and pesticides, upgrading and constructing roads, and creating fuel breaks. According to the Service, the Project qualifies under Section 603(a)(1) of the Healthy Forest Restoration Act, 16 U.S.C. § 6591b(a)(1), for a categorical exemption from the environmental review requirements of the National Environmental Policy Act, 42 U.S.C. §§ 4321–4370m-12.

22. Both the Conservancy and its partner-organization ABRA have a strong interest in actions affecting the Monongahela Forest. Accordingly, Rick Webb—who serves as a Director on ABRA's Board and as a Director-at-Large on the Conservancy's Board—made an informal request by electronic mail on July 7, 2020, asking for basic geographic information system (GIS) files related to the Project from Samuel Lammie, the GIS Coordinator for the Monongahela Forest. Mr. Lammie responded by e-mail on July 20, 2020, explaining that the District Ranger in charge of the Project, Richard Raione, "would like to hold off on distributing the project boundary for now."

*ABRA's Initial Request for Records*

23. In light of the Service's denial of Mr. Webb's informal request, ABRA submitted a formal request under the Act on July 31, 2020 (the Initial Request), seeking information about the Project and its anticipated impacts. ABRA specifically requested:

- All information that was produced by the Forest Service for project scoping and other collaboration with interested parties.

- All information that was received by the Forest Service from interested parties during scoping and any other collaborative interactions.

- All correspondence (formal and informal) between the Forest Service and interested parties during scoping and other collaborative interactions,

including e-mails and notes from meetings, telephone calls, video conferences, etc.

- All information that was presented at meetings (in-person and virtual) between the Forest Service and interested parties, regardless of whether the information was presented by the Forest Service or other parties.

- All existing descriptive and analytical information about the project, including:
  - Project area description and boundary (maps and/or GIS layers),
  - Purpose and Need,
  - Description and location of proposed activity areas (including maps and/or GIS layers),
  - Protective measures for environmental resources,
  - Expected impacts to environmental resources, and
  - Any formal or informal consultation with the U.S. Fish and Wildlife Service (including formal and informal correspondence, e-mails, call notes, meeting notes, etc.).

24. Although signed by ABRA's Executive Director, the Initial Request was primarily prepared by Mr. Webb and Kent Karriker—who serves as a Director-at-Large on the Conservancy's Board and chairs the Conservancy's Public Lands Management Committee.

*The Service's Inadequate Response to the Initial Request*

25. The Service provided its final response to the Initial Request by letter dated November 16, 2020 (the Response Letter). In the Response Letter, the Service stated that, after conducting "[a] reasonable search," it had identified 558 pages of records responsive to the Request. Of those 558 pages, the Service released 489 pages free of any redactions, and released the remaining 69 pages subject to partial redaction under Sections 552(b)(4), (5), and (6) of the Act. As relevant here, the Service explained it had redacted "communications of a deliberative nature" protected by the deliberative process privilege, "includ[ing] emails of a deliberative nature that would be [sic] available to the public." *Id.* at 2.

26. Accompanying the Response Letter was a 561-page portable document format (PDF) file named "2020-FS-R9-05587-F_Freeman_Final.pdf," which includes the three-page Response Letter and the 558 pages of responsive records. The Service's disclosure did not contain any GIS files, nor did its Response Letter indicate any attempt to search for GIS data. The responsive documents the Service *did* provide, however, include multiple references to existing GIS files—including some that, based on their filename or the context in which they are referenced, relate specifically to the GHFR Project.

*ABRA's Administrative Appeal Regarding the Initial Request*

27. On February 12, 2021, ABRA, by counsel, filed an administrative appeal (the Appeal) under Section 552(a)(6)(A)(ii) of the Act and 7 C.F.R. § 1.9. As relevant here, ABRA's appeal challenged the Service's manifest failure to conduct a search reasonably calculated to produce GIS data responsive to ABRA's request, as well as its decision to withhold portions of three documents under Exemption Five.

28. As of the date of this filing, neither ABRA, the Conservancy, nor their counsel has received a determination on any aspect of the February 12, 2021 Appeal.

*ABRA's Second Request for Records*

29. Information within the Service's November 16, 2020 disclosure raised additional questions regarding the GHFR Project, prompting ABRA to submit another request by electronic mail on February 12, 2021 (the Second Request). ABRA's Second Request sought a variety of documents related to the GHFR Project, including several documents specifically named in

the Service's November 16, 2020 disclosure but potentially beyond the scope of the Initial

Request. Specifically, ABRA requested:

(a) The following records—including any renamed, revised, updated, or otherwise modified versions—referenced in the tranche of documents provided in response to ABRA's July 31, 2020 request:

- the following data layers discussed in a document styled as "Supplemental Information to Gauley Health Forest Restoration CE" and dated February 7, 2020:
  - the "soil sensitivity layer generated for the Monongahela National Forest using soil survey data coupled with management limitations for soil types based on their physical and chemical properties," and
  - the "spatial data layer[ ]" for "acid deposition ratings . . . also used in th[e] analysis;"
- any "project implementation plan" that outlines "project activity specifics," as contemplated in a document styled as "Gauley Healthy Forest Restoration Project Categorical Exclusion Review;" and
- the following records described in a document styled as "Gauley Health [sic] Forest Restoration Categorical Exclusion: Effects to the Soil Resource" and dated January 2020:
  - Air_resource_update_dec_2018 and
  - AcidDep_ForestHealth_BriefingPaper_O'dea.

(b) The Scoping Notice for the Project and any comments received thereon.

(c) The most-current version of the Categorical Exclusion Review form for the Project, and associated documents—including description(s) of the Project, regulatory compliance screening, and effects reports for all resource areas.

(d) The most-current version of any Biological Evaluation, Biological Assessment, or Biological Opinion relating to the Project, including appendices and any pertinent analyses upon which those documents are based.

(e) All documents, data, or analysis submitted to the United States Fish and Wildlife Service related to consultation on the potential effects of the Project on the candy darter or its habitat.

(f) All requests for documents, data, or analysis from the United States Fish and Wildlife Service related to consultation on potential effects of the Project on the candy darter or its habitat.

(g) All GIS data layers or other information indicating the location and extent of colluvial soils in the Project area.

(h) Plans for monitoring the effects of the Project on environmental resources—including planned data collection locations, identification of data to be collected, schedule of data collection, and plans for public sharing of monitoring data.

(i) Restoration and decommissioning plans for new and reconstructed temporary roads (including all log skidder routes) associated with the Project.

(j) Boundary and treatment layers for Gauley Ranger District Red Spruce Restoration Project (circa 2014).

(k) Boundary and treatment layers for Gauley Integrated Spruce Restoration Project (circa 2017).

(l) Any records documenting or otherwise related to "RAC involvement" with the GHFR Project, as contemplated in the agenda and notes for a meeting held on November 14, 2019.

(m) Any and all records that were encompassed within ABRA's initial July 31, 2020 request, but have since been revised, updated, or otherwise modified, or created.

30. Although signed by ABRA's counsel, the Second Request, like the Initial Request, was prepared in part by Mr. Webb and Mr. Karriker.

31. On March 2, 2021, ABRA's counsel received an e-mail message from District Ranger Richard Raione (the Raione E-Mail). The body of the Raione E-Mail read, in its entirety:

> We are in receipt of the FOIA request dated February 12, 2021. As shared with the Allegheny–Blue Ridge Alliance on August 27, 2020, please see the attachment for overall status. There has been little to no work conducted on this project since this August 2020 meeting. In terms of updates to the attachment, we are anticipating a concurrence letter from SHPO sometime in March or April 2021 and a biological evaluation has now been completed. Consultation with the Fish and Wildlife Service has not yet begun and a decision on this action is potentially targeted for fiscal year 2022. Thanks for your ongoing interest in this project.

Attached to the E-Mail was a two-page document styled as a "Gauley HFRA Project Update" and dated September 2020. *Id.* at 2–3. The document included a generalized

description of the Project, the Service's practical and legal justification for undertaking it, and its current regulatory status. *Id.* at 2.

32. Neither the Raione E-Mail nor its attachment explained whether the Service had conducted a search for records responsive to ABRA's Second Request. Nor did either document indicate the number of responsive documents the Service intended to disclose and withhold, ABRA's appeal rights under the Act, or that the Service was facing "unusual circumstances" justifying an extension of the time limit prescribed by Section 552(a)(6)(i).

*ABRA Agrees to Revise the Pending Appeal and the Second Request*

33. On March 18, 2021, ABRA's counsel discussed the pending Second Request with Melani R. Gonzalez, a Government Information Specialist in the Service's Office of Regulatory and Management Services. Ms. Gonzalez represented that the Service could more promptly respond to the Second Request and to portions of ABRA's Appeal of the Initial Request if ABRA agreed to:

(a) revise the Appeal to challenge only the redactions in the Service's November 2020 disclosure, and not the adequacy of the Service's search for documents responsive to ABRA's Initial Request; and

(b) revise the pending Second Request so as to include all records encompassed within ABRA's Initial Request but omitted from the Service's November 2020 disclosure.

Ms. Gonzalez explained that those amendments would allow the Service to conduct a single search for records relevant to the Project, rather than two distinct searches—one for records encompassed by the Initial Request and the pending Appeal, and another for records responsive to the Second Request.

34. ABRA's counsel verbally agreed to the revisions proposed by Ms. Gonzalez on March 18, 2021. As a result of those revisions, the Service had before it:

    (a) a revised administrative appeal challenging only the redactions identified in ABRA's February 12, 2021 Appeal (the Revised Appeal); and

    (b) a request for:

        (i) all records described in ABRA's February 12, 2021 Second Request, as recited above in paragraph 29, and

        (ii) all records described in ABRA's July 31, 2020 Initial Request, as recited above in paragraph 23, except those records included in the Service's November 16, 2020 disclosure in response to that Request

    (the Revised Second Request).

35. Although Ms. Gonzalez represented that she would memorialize the agreement in an imminent e-mail, the Service did not contact ABRA or its counsel until, on March 28, 2021, ABRA's counsel sent an e-mail message to Ms. Gonzalez, reciting ABRA's understanding of the agreement and asking the Service to confirm those details in writing.

36. On March 30, 2021, ABRA's council received an e-mail message from Ms. Gonzalez (the Gonzalez E-Mail), advising ABRA that the Service's "Regional FOIA Coordinator and the Monongahela National Forest FOIA Coordinator . . . will be moving forward with the amended request which will include the second search related to [the Second Request] as well as newly identified records in the [Initial R]equest." The Gonzalez E-Mail also stated that the Service would provide "a new FOIA tracking number for th[e Revised Second Request] shortly."

37. On April 1, 2021, ABRA's counsel received an e-mail message from the Service's Regional FOIA Coordinator, Douglas J. Meloche (the Meloche E-Mail), advising ABRA that its "request was received on March 30, 2021 and has been assigned the tracking number #2021-FS-R9-03105-F."

38. The Meloche E-Mail also included a description of the pending request, which included "[a]ll current GIS files for the Gauley Healthy Forest Restoration Project," but omitted several categories of documents described in ABRA's Second Request.

39. Finally, the Meloche E-Mail stated that the pending request "will require a thorough and wide-ranging search for records involving separate offices," and that the Service was therefore "invok[ing] a ten 10-day extension for [the] request pursuant to 5 U.S.C. § 552(a)(6)(B)."

40. On April 20, 2021, ABRA's counsel sent Mr. Meloche an e-mail message, clarifying the scope of the pending Revised Second Request. Specifically, ABRA's counsel pointed out that, per his discussions with Ms. Gonzalez, the Revised Second Request should encompass the following records in addition to those enumerated in the Meloche E-Mail:

    (a) any "non-GHFR-specific GIS data layers that were nonetheless used in developing or evaluating the [P]roject;"

    (b) any "GIS data layers or other information indicating the location and extent of colluvial soils in the Project area;"

    (c) any "project implementation plan" that outlines "project activity specifics;"

(d) the "most-current version of any Biological Evaluation, Biological Assessment, or Biological Opinion relating to the Project, including appendices and any pertinent analyses upon which those documents are based;" and

(e) any "records that were encompassed within [ABRA's] July 31, 2020 [Initial Request], but have since been revised, updated, or otherwise modified, or created."

*ABRA Assigns its Statutory Rights to the Conservancy*

41. While the Revised Second Request and Revised Appeal were pending, ABRA undertook a review of its current projects and the allocation of its resources. In the course of that review, ABRA, the Conservancy, Mr. Webb, and Mr. Karriker all agreed that the Conservancy was better situated to lead research into the GHFR Project, and that Mr. Webb and Mr. Karriker could seamlessly continue that research in their capacity as representatives of the Conservancy.

42. On June 14, 2021, ABRA and the Conservancy sent a letter by electronic mail to Mr. Meloche, with copies to Ms. Gonzalez and Karen Stevens, FOIA Coordinator for the Monongahela National Forest. The letter advised the Service that ABRA had assigned to the Conservancy all of ABRA's legal rights, benefits, and interests with respect to the Initial Request, the Revised Appeal, and the Revised Second Request. Attached to that letter was a verified agreement between ABRA and the Conservancy, reciting the relationship between the two parties and memorializing the assignment of rights. The agreement included notarized signatures of Lewis Freeman, ABRA's executive director, and Larry Thomas, the Conservancy's president.

43. As of the date of this filing, neither ABRA, the Conservancy, nor their counsel has received a response to the Revised Second Request or a determination on any aspect of the Revised Appeal.

## CLAIMS FOR RELIEF

### I.

**Initial Request / Revised Appeal
(Appeal Tracking No. 2021-FS-WO-00063-A):
Failure to Make Timely Determination Regarding Administrative Appeal**

44. Section 552(a)(6)(A)(ii) of the Act requires the Service to "make a determination with respect to any appeal within twenty days (excepting Saturdays, Sundays, and legal public holidays) after the receipt of such appeal."

45. Although Section 552(a)(6)(B) allows the Service to extend the time limit for responding to an administrative appeal by up to ten working days in statutorily defined "unusual circumstances," the Service has not invoked any of the "unusual circumstances" enumerated in Section 552(a)(6)(B)(iii). Nor has the Service tolled the response time under Section 552(a)(6)(A)(ii) by requesting additional information regarding the Appeal or the underlying Request.

46. The Service has therefore failed to make a determination on the Revised Appeal within the time limits prescribed by Section 552(a)(6) and has violated the Conservancy's right under Section 552(a)(6)(A)(ii) to a timely and lawful determination on its Appeal. This is true regardless of whether the Service is deemed to have received the Revised Appeal on February 12, 2021, when ABRA first submitted the original Appeal, which contained all grounds for

appeal raised in the Revised Appeal; on March 18, 2021, when ABRA's counsel verbally agreed to amend the original Appeal; on March 28, 2021, when ABRA's counsel sent the Service an e-mail message memorializing those amendments in writing; or on March 30, 2021, when the Service itself acknowledged the amendments in writing.

47. Section 552(a)(6)(C)(i) provides that a requester "shall be deemed to have exhausted his administrative remedies with respect to such request if the agency fails to comply with the applicable time limit provisions of" Section 552(a)(6). Because the Service failed to make a determination on the Revised Appeal within the time limits prescribed by Section 552(a)(6)(A)(ii), the Conservancy has exhausted the Service's administrative process with respect to that Appeal and to all aspects of the Initial Request relevant to that Appeal.

## II.

### Initial Request / Revised Appeal
### (Appeal Tracking No. 2021-FS-WO-00063-A):
### Failure to Disclose Non-Exempt Portions of Records

48. Section 552(a)(3)(A) of the Act generally requires that the Service "make . . . records promptly available to any person" who submits a request "reasonably describ[ing] such records." 5 U.S.C. § 552(a)(3)(A). The Service may withhold records or portions of records reasonably described in the Initial Request only if they "fall squarely within one of nine statutory exemptions" set forth in Section 552(b). *Klamath Water Users*, 532 U.S. at 8. Under Section 552(a)(4), the Service bears the burden of justifying its decision to withhold any of those records or portions thereof.

49. Exemption Five, 5 U.S.C. § 552(b)(5), allows the Service to withhold "documents reflecting advisory opinions, recommendations and deliberations comprising part of a process by which governmental decisions and policies are formulated." *Klamath Water Users*, 532 U.S. at 8.

50. The Service has violated the Conservancy's rights under the Act by failing to provide it with records and information responsive to the Initial Request but ineligible for withholding under Exemption Five—including:

    (a) a document styled as the "Gauley Healthy Forest Restoration Project Categorical Exclusion Review," and purporting to contain a list of "agencies, organizations and/or persons" that the Service "contacted to provide input to, or be made aware of, the propos[ed]" Project, together with a "brief overview of feedback or comments provided" by those contacted;

    (b) the agenda and notes for a meeting held on November 5, 2019, documenting a determination that the Project does not require a "DM"—presumably a decision memo—under "605"—presumably Section 605 of the Healthy Forests Restoration Act; and

    (c) a document purporting to explain how the Monongahela National "Forest Plan standards should be applied with respect to the soil and watershed resources for the Gauley RD CE project.

51. In addition or in the alternative, the Service has violated the Conservancy's rights under the Act by failing to provide sufficient evidence or explanation in support of its decision to withhold records or information responsive to the Initial Request.

52. As detailed above in paragraph 47, the Conservancy has exhausted the Service's internal administrative process with respect to the relevant aspects of ABRA's Initial Request.

### III.

**Initial Request / Revised Appeal
(Appeal Tracking No. 2021-FS-WO-00063-A):
Failure to Provide Reasonably Segregable Portions of Responsive Records**

53. For any responsive records that contain information exempt from disclosure, Section 552(b) of the Act requires the Service to disclose any non-exempt information that is reasonably segregable from protected information. To demonstrate that any non-exempt information cannot be reasonably segregated from protected information, the Service must, at the very least, "describe what proportion of the information in a document is non-exempt and how that material is dispersed throughout the document." *Trea Senior Citizens League v. Department of State*, 923 F. Supp. 2d 55, 70 (D.D.C. 2013) (quoting *Mead Data*, 566 F.2d at 261).

54. To the extent any information encompassed by the Initial Request qualifies for a statutory exemption, the Service nonetheless violated the Conservancy's rights under the Act by unlawfully withholding non-exempt information that is reasonably segregable from the exempt information.

55. In addition or in the alternative, the Service has violated the Conservancy's rights under the Act by failing to provide sufficient evidence or explanation in support of its conclusion that it has disclosed all reasonably segregable portions of the records it provided in response to the Initial Request.

56. As detailed above in paragraph 47, the Conservancy has exhausted the Service's internal administrative process with respect to the relevant aspects of ABRA's Initial Request.

## IV.

### Revised Second Request
### (FOIA Tracking No. 2021-FS-R9-03105-F):
### Failure to Respond to Request

57. Section 552(a)(6)(A)(i) of the Act requires the Service to make a determination on the Second Request within twenty working days and to "immediately notify" the requester of, among other things, that "determination and the reasons therefor."

58. Section 552(a)(6)(B) allows the Service to extend that time limit by up to ten working days in statutorily defined "unusual circumstances"—including, among other things, "the need to search for and collect the requested records from field facilities or other establishments that are separate from the office processing the request," 5 U.S.C. § 552(a)(6)(B)(iii)(I); or "the need to search for, collect, and appropriately examine a voluminous amount of separate and distinct records which are demanded in a single request," *id.* § 552(a)(6)(B)(iii)(II).

59. Even assuming that the circumstances described in the Meloche E-Mail in fact constitute "unusual circumstances" under Section 552(a)(6)(B), the Act requires the Service respond to a request for records no more than thirty days after receiving that request. 5 U.S.C. §§ 552(a)(6)(A)(i), 552(a)(6)(B). The Service has not tolled the response deadline under Section 552(a)(6)(A)(ii) by requesting additional information regarding any aspect of the Revised Second Request.

60. Neither the March 2, 2021 Raione E-Mail nor the April 1, 2021 Meloche E-Mail constitute a "determination" under Section 552(a)(6)(A)(i), as neither "communicate[s] the scope of the documents [the Service] intends to produce and withhold, and the reasons for withholding any documents," nor does either explain the statutory rights to appeal the Service's response. *Citizens for Responsibility & Ethics*, 771 F.3d at 187.

61. Because the Service has failed to provide a valid response to the Revised Second Request under Section 552(a)(6), the Service has violated the Conservancy's right under Section 552(a)(6)(A)(i) to a timely and lawful response to the Revised Second Request. This is true regardless of whether the Service is deemed to have received the Revised Second Request, or elements thereof, on July 31, 2020, when ABRA submitted its Initial Request describing many of the records encompassed by the Revised Second Request; on February 12, 2021, when ABRA submitted the Second Request, which described all other records encompassed by the Revised Second Request; on March 18, 2021, when ABRA's counsel verbally agreed to amend the Second Request; on March 28, 2021, when ABRA's counsel sent the Service an e-mail message memorializing those amendments in writing; or on March 30, 2021, when the Service itself acknowledged the amendments in writing.

62. Section 552(a)(6)(C)(i) of the Act provides that a requester "shall be deemed to have exhausted his administrative remedies with respect to [his] request if the agency fails to comply with the applicable time limit provisions of" Section 552(a)(6). 5 U.S.C. § 552(a)(6)(C)(i). Because the Service has failed to provide a valid response to the Revised Second Request within the time limits prescribed by Section 552(a)(6)(A)(i), the

Conservancy has exhausted the Service's administrative process with respect to the Revised Second Request.

## V.

### Revised Second Request
### (FOIA Tracking No. 2021-FS-R9-03105-F):
### Inadequate Search for Responsive Records

63. Section 552(a)(3)(C) of the Act requires that the Service conduct a reasonable search for records responsive to the Second Request, employing all "methods [that] can be reasonably expected to produce the information" described in that Request. *Oglesby*, 920 F.2d at 68.

64. The Service violated the Conservancy's rights under Section 552(a)(3)(A) of the Act by failing to conduct a search reasonably calculated to produce all records responsive to the Revised Second Request, as evinced by its failure to provide any information about the search or any documents produced thereby.

65. As detailed above in paragraph 62, the Conservancy has exhausted the Service's internal administrative process with respect to the Revised Second Request.

## VI.

### Revised Second Request
### (FOIA Tracking No. 2021-FS-R9-03105-F):
### Failure to Disclose Non-Exempt Records

66. Section 552(a)(3)(A) of the Act generally requires that the Service "make . . . records promptly available to any person" who submits a request "reasonably describ[ing] such records." The Service may withhold records or portions of records reasonably described in the Second Request, as amended, only if they "fall squarely within one of nine statutory

exemptions" set forth in Section 552(b). *Klamath Water Users*, 532 U.S. at 8. Under Section 552(a)(4), the Service bears the burden of justifying its decision to withhold any of those records or portions thereof.

67. The Service has violated the Conservancy's rights under Section 552(a)(3)(A) by failing to provide any non-exempt and reasonably segregable information contained in records reasonably described in the Second Request and in the agreement with the Service to amend that Request.

68. In addition or in the alternative, the Service has violated the Conservancy's rights under the Act by failing to provide sufficient evidence or explanation in support of its decision to withhold information contained within records responsive to the Revised Second Request.

69. As detailed above in paragraph 62, the Conservancy has exhausted the Service's internal administrative process with respect to the Revised Second Request.

## PRAYER FOR RELIEF

WHEREFORE, the Conservancy respectfully requests that this Court

(a) declare that the Service violated the Conservancy's statutory rights under the Act;

(b) order the Service to perform a search reasonably calculated to produce all relevant information responsive to the Revised Second Request;

(c) order the Service to disclose all non-exempt records—or reasonably segregable portions thereof—responsive to the Revised Second Request;

(d) enjoin the Service from charging search, review, or duplication fees related to the Initial Request, the Second Request, or the Revised Second Request;

(e)  award the Conservancy its reasonable attorney fees and litigation expenses under Section

552(a)(4)(E) of the Act, 5 U.S.C. § 552(a)(4)(E); and

(f)  provide any other relief the Court deems appropriate.

Dated: August 3, 2021                              Respectfully submitted,

**Evan Dimond Johns**
(D.D.C. Bar ID No. WV0004)
Appalachian Mountain Advocates
Post Office Box 507
Lewisburg, West Virginia 24901
Telephone: (434) 738 – 1863
E-Mail: *ejohns@appalmad.org*

*Counsel for the West Virginia*
*Highlands Conservancy*