UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

WEST VIRGINIA HIGHLANDS
CONSERVANCY,

    *Plaintiff*,

  v.

UNITED STATES FOREST SERVICE,

    *Defendant*.

Civil Action No. 1:21-cv-02079 (CJN)

## MEMORANDUM OPINION

The West Virginia Highlands Conservancy sued to enforce a FOIA request made to the United States Forest Service about the Gauley Healthy Forest Restoration Project. *See generally* Compl., ECF No. 1. But that FOIA request was submitted not by the Conservancy, but by its partner organization, the Allegheny-Blue Ridge Alliance, which later assigned that request to the Conservancy. *See id.* at ¶¶ 4, 22–23, 41–42. The Forest Service therefore moves to dismiss on the grounds that the Conservancy is not suffering an Article III injury, that its claims run afoul of the Anti-Assignment Act,[1] and that the Conservancy fails to identify a waiver of sovereign immunity. *See generally* Mem. in Supp. of Mot. to Dismiss ("Mot."), ECF No. 8-1. The Court denies the Forest Service's Motion.

---

[1] The Anti-Assignment Act is codified at two sections of the United States Code, 41 U.S.C. § 6305 and 31 U.S.C. § 3727. The latter is the only section at issue in this case. Thus, when the Court refers to the "Anti-Assignment Act" broadly, it is referencing 31 U.S.C. § 3727 alone.

1

## BACKGROUND

For purposes of the Motion to Dismiss, the Court, of course, accepts all well-pleaded facts as true. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

The roots of this dispute stretch back to the summer of 2020. According to Forest Service publications, the agency hopes to undertake a restoration project in the Monongahela National Forest, titled the Gauley Healthy Forest Restoration Project. Compl. at ¶ 21. The Project is supposed to make certain "stands" within the Forest "more resilient to insects, disease, and fire by, among other things, harvesting timber, applying herbicides and pesticides, upgrading and constructing roads, and creating fuel breaks." *Id.* The Forest Service believes that the Project qualifies under § 603(a)(1) of the Healthy Forest Restoration Act, 16 U.S.C. § 6591b(a)(1), which makes it categorically exempt from the environmental-review requirements of the National Environmental Policy Act, 42 U.S.C. §§ 4321–4370m-12. *Id.*

The Conservancy and its partner organization, the Allegheny-Blue Ridge Alliance, claim strong interests in any actions that affect the Monongahela Forest. *See id.* at ¶ 22. So it is that Rick Webb—a director on the Alliance's board and a director-at-large for the Conservancy—made an initial, informal request for information about the Project in July of 2020. *Id.* He sought geographic-information-system files from Samuel Lammie, the coordinator for such requests. *Id.* But a few weeks later, Lammie denied Webb's request; the District Ranger in charge of the Project had opted to "hold off on distributing the project boundary for now." *Id.*

The Alliance thus decided to submit a formal FOIA request. *Id.* at ¶ 23. It sought information about the Project and its anticipated impacts. *Id.* While the Alliance's Executive Director signed the request, two Conservancy members—Webb and the chair of its Public Lands

Management Committee, Kent Karriker—were the primary individuals in charge of drafting it. *Id.* at ¶ 24.

The Forest Service gave its final response that November. *See id.* at ¶ 25. It found 558 pages of responsive records, releasing 489 without redaction and 69 with partial redactions under FOIA Exemptions 4, 5, and 6. *Id.* But nowhere in these documents were the geographic-information-system files the Alliance initially sought—despite there being multiple references to such files in other produced documents. *See id.* at ¶ 26.

The Alliance filed an administrative appeal. *See id.* at ¶ 27. It challenged the Forest Service's alleged failure to conduct a reasonable search to locate the geographic-information-system files, as well as its decision to withhold parts of three documents under Exemption 5. *Id.* That appeal is still pending. *See id.* at ¶ 28.

The same day that it filed its appeal, the Alliance submitted another FOIA request. *Id.* at ¶¶ 27, 29. This request, too, sought many documents related to the Project, including several documents named in the Forest Service's previous disclosure. *Id.* at ¶ 29. The request listed specific and detailed explanations of the records sought. *See id.* But the precise content of those requests is not relevant here. While the Alliance's counsel signed this second request, it was once again prepared in part by Webb and Karriker. *Id.* at ¶ 30.

Ultimately, the second request was further narrowed, and the Parties took different positions on just what documents were being requested. *See id.* at ¶¶ 31–40.

It was while the appeal of the first request and discussions regarding the second request were ongoing that the Alliance undertook a review of its current projects. As part of that review, the Alliance, the Conservancy, Webb, and Karriker agreed that the Conservancy was better situated to lead research into the Project. *See id.* at ¶ 41. All agreed that Webb and Karriker could

3

seamlessly continue that research in their capacities as Conservancy representatives. *Id.* Accordingly, the Alliance and the Conservancy sent a letter to all relevant parties advising that the Alliance had assigned all its "legal rights, benefits, and interests with respect to the Initial Request, the Revised Appeal, and the Revised Second Request" to the Conservancy. *Id.* at ¶ 42. Attached to that letter was a verified agreement between the Alliance and the Conservancy, reciting the relationship between the two parties and memorializing the assignment of rights. *Id.* That letter was notarized and included the signatures of both the Alliance's executive director and the Conservancy's president. *Id.*

Neither the Alliance nor the Conservancy received a response to the appeal regarding the first request or to the second request. *See id.* at ¶ 43. This lawsuit, brought solely by the Conservancy, followed. *See generally id.*

## Legal Standards

A motion to dismiss under Federal Rule of Civil Procedure 12(b)(1) challenges this Court's subject-matter jurisdiction. Fed. R. Civ. P. 12(b)(1). Federal courts have limited jurisdiction. *Gunn v. Minton*, 568 U.S. 251, 256 (2013). And a court presumes it lacks jurisdiction "unless the contrary appears affirmatively from the record." *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 342 n.3 (2006) (quoting *Renne v. Geary*, 501 U.S. 312, 316 (1991)). When assessing such a motion, "the court assumes the truth of all material factual allegations in the complaint and construes the complaint liberally, granting plaintiff the benefit of all inferences that can be derived from the facts alleged and upon such facts determines jurisdictional questions." *Kangarloo v.*

*Pompeo*, 480 F. Supp. 3d 134, 137 (D.D.C. 2020) (quoting *Am. Nat'l Ins. Co. v. FDIC*, 642 F.3d 1137, 1139 (D.C. Cir. 2011)) (quotation marks omitted) (alterations accepted).

A Rule 12(b)(6) motion to dismiss, on the other hand, alleges a failure to state a claim. Fed. R. Civ. P. 12(b)(6). When assessing this type of motion, the Court must "treat the complaint's factual allegations as true . . . and must grant plaintiff the benefit of all inferences that can be derived from the facts alleged." *Holy Land Found. for Relief & Dev. v. Ashcroft*, 333 F.3d 156, 165 (D.C. Cir. 2003) (quoting *Sparrow v. United Air Lines, Inc.*, 216 F.3d 1111, 1113 (D.C. Cir. 2000)). "[A] formulaic recitation of the elements of a cause of action," however, "will not do"; a complaint must provide more than mere labels and conclusions. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). Put differently, a claim to relief must be "plausible on its face," and the pleadings must "nudge[ the] claims across the line from conceivable to plausible." *Id.* at 570.

## I. THE CONSERVANCY HAS STANDING

In a single paragraph, the Forest Service argues that the Conservancy lacks Article III standing. *See* Mot. at 4. In particular, it contends that the Conservancy has not suffered an injury in fact, as it was not the one to submit the FOIA request. *See id.* Because standing is a jurisdictional requirement, the Court must assess it before considering any merits inquiries. *Steel Co. v. Citizens for a Better Envt.*, 523 U.S. 83, 102 (1998).[2]

It is one of "the irreducible constitutional minimum of standing," *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992), baked into the very concept of a "Case[ ]" or "Controvers[y]," U.S.

---

[2] The Forest Service seems to abandon this line of argument in its Reply Brief, ECF No. 12. It relegates the argument to a sentence in a footnote, *see id.* at 8 n.2, despite the Conservancy's having addressed it at length in its Response. *See* ECF No. 10 at 6–7. Courts generally treat such failures to respond as abandonment of the legal argument. *See, e.g.*, *Wal-Mart Stores, Inc. v. Sec'y of Labor*, 406 F.3d 731, 736 n.\* (D.C. Cir. 2005) ("Wal-Mart raised this issue anew in a single paragraph of its opening brief, the Secretary pointed to the ALJ's holding, and Wal-Mart seems by its silence in reply wisely to have abandoned the argument."). But an Article III court must

Const. Art. III, § 2, that a plaintiff suffer from an injury in fact. After all, "[f]ederal courts do not possess a roving commission to publicly opine on every legal question." *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2203 (2021).

Showing an injury in fact is not burdensome. It requires only that a plaintiff demonstrate an invasion of a legally protected interest that is concrete, particularized, and actual or imminent. *Id.* And a plaintiff like the Conservancy benefits from the posture of a motion to dismiss, since the Court will resolve all reasonable factual inferences in its favor when determining jurisdictional questions at this stage. *Kangarloo*, 480 F. Supp. 3d at 137.

The Forest Service's argument proceeds in two steps: "There is no dispute that Plaintiff has not submitted its own FOIA request. Plaintiff therefore cannot establish that it experienced an injury-in-fact on that basis." Mot. at 4. No doubt, a FOIA case requires a FOIA request for there to have been any injury. *See Wetzel v. Dep't of Veterans Affairs*, 949 F. Supp. 2d 198, 202 (D.D.C. 2013). But no one disputes that the Forest Service received two valid FOIA requests. *See* Compl. at ¶¶ 23, 29. The Forest Service's argument thus relies on the premise that, if a party does not submit a FOIA request on its own, it can never suffer an injury in fact.

But it is hard to see how that follows, at least on the allegations here. The Conservancy plausibly alleges (and thus the Court must assume as true for purposes of the motion to dismiss) that it was assigned the rights to the FOIA requests by the Alliance. By allegedly not complying with the FOIA requests, the Forest Service has therefore failed to produce documents to which the Conservancy is entitled as a result of the assignment. That is injury in fact, and thus the Conservancy has adequately alleged Article III standing. *Nat'l Sec. Counselors v. CIA*, 960 F.

---

always assure itself that it has jurisdiction over a matter. *Kaplan v. Ctr. Bank of the Islamic Republic of Iran*, 896 F.3d 501, 511 (D.C. Cir. 2018). The Court must therefore consider the question.

Supp. 2d 101, 140–41 (D.D.C. 2013); *see also Vermont Agency of Nat. Resources v. United States*, 529 U.S. 765, 773 (2000) ("[T]he assignee of a claim has standing to assert the injury in fact suffered by the assignor.").

The Forest Service's standing argument is thus really wrapped up in the merits of its assignment challenge. It is to that question the Court turns next.

## II. THE ANTI-ASSIGNMENT ACT DOES NOT BAR THE ASSIGNMENT OF FOIA CLAIMS

As used in the Anti-Assignment Act, the term "assignment" means either "(1) a transfer or assignment of any part of a claim against the United States Government or of an interest in the claim; or (2) the authorization to receive payment for any part of the claim." 31 U.S.C. § 3727(a). So defined, the Act broadly prohibits all assignments of claims against the United States, unless certain specific procedures are met:

> An assignment may be made only after a claim is allowed, the amount of the claim is decided, and a warrant or payment of the claim has been issued. The assignment shall specify the warrant, must be made freely, and must be attested to by 2 witnesses. The person making the assignment shall acknowledge it before an official who may acknowledge a deed, and the official shall certify the assignment. The certificate shall state that the official completely explained the assignment when it was acknowledged. An assignment under this subsection is valid for any purpose.

*Id.* § 3727(b).

The Forest Service argues that, because the Alliance's FOIA claim is "a claim against the United States Government," any assignment to the Conservancy fails to satisfy the Anti-Assignment Act. *See* Mot. at 5–8.

### A. Contemporary definitions of "claim" suggest a nexus with property-based disputes

The Court starts, as it must, with the text of the statute. In particular, and as the Parties agree, the Court must determine what the Act means when it refers to "claims." *Compare* Mot. at

7

5 *with* Pl.'s Resp., ECF No. 10, at 9.  The Forest Service argues that "claims" is a general term, used in the Anti-Assignment Act to refer to all types of lawsuits.  *See, e.g.*, Mot. at 5.  The Alliance argues that it refers to monetary claims alone.  *See, e.g.*, Pl.'s Resp. at 9.

Both definitions comport with the modern understanding of the word.  But the Court must determine its ordinary meaning when the statute was enacted.  *See New Prime Inc. v. Oliveira*, 139 S. Ct. 532, 539 (2019) (quoting *Wisconsin Central Ltd. v. United States*, 138 S. Ct. 2067, 2074 (2018)).  In this case, that is 1853—the year that Congress passed and President Pierce signed the Act into law.  *See Bailey v. United States*, 78 Fed. Cl. 239, 265 (2007).

While not uniform, contemporary definitions of "claim" tended to have a relationship to property, whether money or real property.  Perhaps the most relevant is the 1859 definition from Alexander Burrill in his *A Law Dictionary and Glossary*.  As Burrill defined it, a claim could be:

- A challenge [or demand] by any man, of the property or ownership of a thing, [or of some interest in it,] which he has not in possession, but which is withholden from him unlawfully.
- An unascertained right to property in the possession of another.
- A right or title, actual or supposed, to a debt, privilege, or other thing in the possession of another.
- The means to an end, and not the end itself.  A claim for dower is not an estate in dower.  Claims include notes.
- A demand of some matter as of right made by one person upon another, to do or to forbear to do some act or things as a matter of duty.

*Claim*, *A Law Dictionary and Glossary, Vol. I* (2nd ed. 1859) (brackets in original) (citations omitted).  This definition is similar to definitions from two nonlegal dictionaries both before and after the enactment of the Act.  In the 1828 edition of Websters, for example, "claim" was defined as:

> 1. A demand of a right or supposed right; a calling on another for something due, or supposed to be due; as a *claim* of wages or services.  A claim implies a right or supposed right in the claimant to something which is in another's possession or power.  A claim may be made in words, by suit, and by other

8

>means.  The word is usually preceded by *make* or *lay*; to *make claim*; to *lay claim*.
>
>2.  A right to claim or demand; a title to any debt, privilege or another thing in possession of another; as, a prince has a *claim* to the throne.
>
>3.  The thing claimed, or demanded.

*Claim*, *An American Dictionary of the English Language, Vol. I* (1st ed. 1828).  With trivial differences, the same definitions appeared in the 1880 edition of that dictionary.  *See Claim*, *Webster's Complete Dictionary of the English* Language (new ed. 1880).[3]

To be sure, the last definition from Burrill supports a definition broader than just claims for money or property, as do some of the lay definitions.  But the other definitions—especially and predominantly in the legal context—favor a property-based reading of the term.  Thus, while contemporary dictionaries shine some light on the question here, they do not resolve it entirely.

### B. The surrounding text of the Anti-Assignment Act strongly suggests that it applies to only property-based claims

But while the definition of "claim" alone leaves some ambiguity, the text of the Anti-Assignment Act provides further clarity.  In fact, it would make little-to-no sense to read the Act as applying to claims for things other than money or property.  Each subsection makes this clear.

Take subsection (a), which defines "assignment":

>(a) In this section, "assignment" means—
>
>>(1) a transfer or assignment of any part of a claim against the United States Government *or of an interest in the claim*; or
>>
>>(2) the authorization *to receive payment* for any part of the claim.

---

[3] While later in date, the only relevant definition from the first edition of Black's Law Dictionary in 1891 is similar—"A challenge of the property or ownership of a thing which is wrongfully withheld from the possession of the claimant."  *Claim*, *Black's Law Dictionary* (1st ed. 1891).

9

31 U.S.C. § 3727(a) (emphasis added). Both definitions of "assignment" suggest that a "claim" is one to money.

Similar is subsection (b), which provides that "[a]n assignment may be made only after a claim is allowed, *the amount of the claim* is decided, and a *warrant for payment* of the claim has been issued." § 3727(b) (emphasis added). The only way these procedural requirements make sense is if the "claims" are ones for property, most specifically money. So too for the remaining procedures in subsection (b), which require "[t]he person making the assignment" to "acknowledge it before an official who may acknowledge a deed"—let alone to require that official to "certify the assignment," in addition to having the assignment "be attested to by 2 witnesses." These provisions would be expected and standard for monetary or property claims, but not for other kinds of claims.

Subsection (c), in turn, carves out from subsection (b) certain assignments to financing institutions:

> (c) Subsection (b) of this section does not apply to an assignment to a financing institution of money due or to become due under a contract providing for payments totaling at least $1,000 when—
> (1) the contract does not forbid an assignment;
> (2) unless the contract expressly provides otherwise, the assignment—
>     (A) is for the entire amount not already paid;
>     (B) is made to only one party, except that it may be made to a party as agent or trustee for more than one party participating in the financing; and
>     (C) may not be reassigned; and
> (3) the assignee files a written notice of the assignment and a copy of the assignment with the contracting official or the head of the agency, the surety on a bond on the contract, and any disbursing official for the contract.

§ 3727(c). Again, the focus here is on monetary claims.[4]

No different is the next subsection, § 3727(d), which states that "[d]uring a war or national emergency proclaimed by the President or declared by law and ended by proclamation or law," certain contracts[5] can provide (or "may be changed without consideration to provide") "that a *future payment* under the contract to an assignee is not subject to reduction or setoff." § 3727(d) (emphasis added). That subsection continues to explain that "[a] *payment subsequently due* under the contract (even after the war or emergency is ended) *shall be paid* to the assignee without a reduction or setoff for liability of the assignor" under certain circumstances. *Id.* (emphasis added). Again, this language only makes sense if "claim" refers to monetary claims alone.

Consider finally the last subsection of the Act, § 3727(e). It provides:

(e)
  (1) An assignee under this section does not have to make *restitution of, refund, or repay the amount received* because of the liability of the assignor to the Government that arises from or is independent of the contract.

  (2) The Government may not *collect or reclaim money paid* to a person receiving an amount under an assignment or allotment of pay or allowances authorized by law when liability may exist because of the death or the person making the assignment or allotment.

---

[4] Of course, § 3727(c) merely carves out a certain species of assignments from § 3727(b). Thus, it could be contended that this provision sheds little light on the meaning of "claim" generally in the Anti-Assignment Act. (After all, it is common ground between the Parties that that monetary claims are covered by the Act.) In any event, this provision is still evidence, even if slight, that points to the narrower definition of the term. The Court further notes that this subsection never uses the word "claim," instead providing that "[s]ubsection (b) of this section does not apply to an assignment *to a financing institution*" of certain claims. § 3727(c) (emphasis added). This language suggests that the claims at issue are monetary ones; it is just the party to whom the assignment is being made that is the focus.

[5] Specifically, a "contract with the Department of Defense, the General Service Administration, the Department of Energy (when carrying out duties and powers formerly carried out by the Atomic Energy Commission), or other agency the President designates." § 3727(d).

11

§ 3727(e) (emphasis added).  Again, the focus of this subsection is entirely on monetary claims.

\*   \*   \*

The Anti-Assignment Act it lays out the ways in which claims against the government can be assigned to other parties, but the focus of each of those provisions is unmistakable:  the Act applies monetary claims and property-based disputes.  A broader reading of "claims" makes those provisions largely nonsensical.

### C. Historical context and precedent support a monetary focus to the meaning of "claims"

Context and history confirm this interpretation.  The Anti-Assignment Act has its origins in 1853, and was originally titled "An Act to prevent frauds upon the treasury of the United States." *See United States v. Gillis*, 95 U.S. 407, 413 (1877).[6]  It was born out of a special committee of the House of Representatives, which was appointed to investigate "whether certain claims awarded by the Mexican War Claims Commission were fraudulent."  *Bailey*, 78 Fed. Cl. at 265.  And fraudulent they were:  "The committee determined that the claims were fraudulent, having rested

---

[6] The text of that original Act was slightly different than it is today.  As the *Gillis* Court reported, it provided that

> [A]ll transfers and assignments . . . made of any claim upon the United States, or any part or share thereof . . ., and all powers of attorney, orders, or other authorities for receiving payment of any such claim, or any part or share thereof, shall be absolutely null and void, unless the same shall be freely made and executed in the presence of at least two attesting witnesses, after the allowance of such claim, the ascertainment of the amount due, and the issuing of a warrant for the payment thereof.

*Gillis*, 95 U.S. at 413 (quoting 10 Stat. 170, § 1).  Strong parallels remain, however, particularly to § 3727(b).  The use of the word "claim" remains constant.

on false testimony and forged documents[.]" *Id.* Preventing such monetary fraud was the purpose behind the Act. *See id.*

This monetary focus is consistent with how courts have interpreted the Act ever since. As the Supreme Court explained nearly a hundred-fifty years ago in *Hobbs v. McLean*: "What is a claim against the United States is well understood. It is a right to demand money from the United States. . . . [The Anti-Assignment Act], it is clear, only refers to claims against the United States which can be presented by the claimant to some department or officer of the United States for payment, or may be prosecuted in the court of claims." 117 U.S. 567, 575 (1886); *cf. Nevada v. Herrington*, 827 F.2d 1394, 1399 (9th Cir. 1987) ("In the traditional sense a claim against the government means a right to demand money from the United States." (citing *Hobbs*, 117 U.S. at 575)).[7]

As the Federal Circuit has observed, the dual provisions of the Act itself are contained in two separate titles of the United States Code: Title 41, "(which deals with 'Public Contracts')," and Title 31, "(which deals with 'Money and Finance')." *Fireman's Fund Ins. v. England*, 313 F.3d 1344, 1349 (Fed. Cir. 2002). The provision at issue here is situated in the Subtitle of "III. Financial Management" and under Chapter 37, titled "Claims." That is the same location as the False Claims Act, which was enacted in 1863. And the False Claims Act defines "claim" to mean a "request or demand . . . for money or property[.]" 31 U.S.C. § 3729(b)(2). While none of this is conclusive on its own, it supports the conclusion that the Act is not as broad as the government contends.

---

[7] The Forest Service disputes the importance of *Hobbs*, pointing out that other cases show that the Act applies to legal and equitable assignments alike. *See* Def.'s Reply, ECF No. 12, at 3. But that does little to refute the narrow definition of "claim" the Court *did* assign in *Hobbs* itself.

**D. The Forest Service's arguments to the contrary do not withstand scrutiny**

The Forest Service offers several arguments to the contrary, but none carries the day. It first contends that "[t]he plain language of the Act demonstrates that it is not limited to monetary claims, but rather encompasses 'any part of a claim against the United States Government,' including claims asking a court to exercise equitable jurisdiction over the Government, as Plaintiff asks the Court to do in this FOIA action." Mot. at 5. For the reasons discussed above, that is not the best reading of the Act.

The Forest Service also relies the 1980 District of Vermont case of *Marger v. Bell*, 510 F. Supp. 9. Whatever the force of a forty-two-year-old, out-of-circuit District Court decision, it is hard to follow why the Forest Service invokes it here. In that case, DEA agents seized a quarter-million dollars in cash from a lawyer's client. *See id.* at 11. The client then "assigned 'all her right, title and interest' in the money to the lawyer, 'by way of attorneys' fees and costs.'" *Id.* The lawyer then sued for return of the cash. *See id.* The dispute thus was, at all times, one to recover money and money alone: "Plaintiff seeks the return of the money under Fed. R. Crim. P. 41(e) and 28 U.S.C. § 1361." *Id.* The Court concluded that the Anti-Assignment Act barred the assignment of the claim for the money: "In the present case, plaintiff's claim to the seized money arises solely from the purported assignment given by Nichols, and not upon his own independent right to the money. As such, plaintiff's claim is governed by [the Anti-Assignment Act]. Since the assignment totally fails to satisfy the requirements of that statute, the assignment is unenforceable against the United States." *Id.* at 12.

The Forest Service also relies on *Naartex Consulting Corporation v. Watt*, 722 F.2d 779 (D.C. Cir. 1983). *See* Mot. at 6. That case "beg[an] with a lottery, held in Wyoming in 1975 by the Department of Interior to select a lessee for a parcel of land in Wyoming that was, at that time

14

outside any known producing oil or gas field.  Two years later, the land began producing oil; and two years later still, Naartex Consulting Corporation, acting on behalf of an unsuccessful applicant in the lottery, challenged the issuance of the lease." *Naartex*, 722 F.2d at 782 (parenthetical omitted).  Naartex thought the initial issuance of the lease violated various statutes.  *See id.* at 782–83.

The Court of Appeals disagreed.  But while it relied on the Anti-Assignment Act in reaching this conclusion, its discussion of that statue was brief.  Naartex claimed to be pressing the rights of one Russell Huff.  *See id.* at 793.  Yet, the Court concluded, "Huff's agreement by letter to 'sell, assign and transfer to [Naartex] all of [Huff's] rights in and to [the lease at issue]' clearly contravenes the[ ] provisions [of the Anti-Assignment Act].  Such inchoate interests in the government lease may not be assigned, and, in any event, the attempted assignment was not witnessed as required by the statute." *Id.* at 794 (first two alterations in original).  The Court then offered that "a central purpose of [the Anti-Assignment Act] was 'that the government might not be harassed by multiplying the number of persons with whom it had to deal.'  The Huff assignment unquestionably violates this clearly articulated policy." *Id.* (quoting *Hobbs*, 117 U.S. at 576).  The Court of Appeals did not otherwise address the scope or applicability of the Act.

The Forest Service relies on this narrow language to create a broad rule:  FOIA actions should be treated like the oil lease in *Naartex*, and thus within the purview of the Act.  *See* Mot. at 6.  The Court disagrees.  Whatever the import of the Act in *Naartex*, that decision does not stand for the broad proposition that all claims, regardless of their type, fall within the Act's purview.  The interest here is not inchoate; it is one that can be assigned.  And to the extent that policy-based arguments are relevant at all, this is not a situation in which the government could potentially be harassed by many parties.

\* \* \*

For the foregoing reasons, the text and history of the Act confirm that FOIA actions do not fit within its otherwise broad prohibitions.

The Act may, however, bar the transfer of any attorneys' fees and costs accumulated by the assignor, unless its procedures are followed. But that question is not yet before the Court.

### III. THE DOCTRINE OF SOVEREIGN IMMUNITY DOES NOT PRECLUDE ASSIGNMENT

The Forest Service also contends that the doctrine of sovereign immunity precludes the assignment at issue here. *See* Mot. at 8–11. The Court disagrees.

FOIA itself waives the government's sovereign immunity. It grants this court "jurisdiction to enjoin the agency from withholding agency records and to order the production of any agency records improperly withheld from the complainant." 5 U.S.C. § 552(a)(4)(B).[8] The Forest Service acknowledges this waiver, but it argues that it does not cover claims by the Conservancy, as the Conservancy is not "the complainant." *See* Mot. at 8–9.

Around the time of FOIA's enactment, a "complainant" was "[o]ne who applies to the courts for legal redress; one who exhibits a bill of complaint. This is the proper designation of one suing in equity, though 'plaintiff' is often[ ] used in equity proceedings as well as at law.". *Complainant*, *Black's Law Dictionary* (rev. 4th ed. 1968). That definition remains the same today. *See Complainant*, *Black's Law Dictionary*, def. 1 (11th ed. 2019) ("The party who brings a legal complaint against another; esp., the plaintiff in a court of equity or, more modernly, a civil suit."). A "complainant" is thus not necessarily the same person who made the initial request—it is the individual who brings the equity action itself.

---

[8] This language has remained constant since the initial enactment of FOIA in 1966. *See* Pub. L. 89-487, 80 Stat. 251.

With that context, the text of § 552(a)(4)(B) comes into focus. The government has waived its sovereign immunity to the extent that there are "any agency records improperly withheld from the complainant"—that is, the individual or organization that applied to the court for legal redress. Here, the Conservancy is the complainant. The government has therefore waived its sovereign immunity as to the Conservancy's FOIA claims.[9]

The Forest Service counters that, "Read in context, the word 'complainant' necessarily means the original requestor because 'agency records' cannot have been 'improperly withheld from the complainant' unless the 'complainant' requested the records in the first place." Def's Reply at 11–12. But that conclusion only follows if the Anti-Assignment Act precludes the assignment here. As discussed above, it does not.

\*     \*     \*

FOIA cases do not usually involve motions to dismiss; instead, they are "typically resolved on motions for summary judgment under Federal Rule of Civil Procedure 56." *Burke v. U.S. Dep't of Homeland Sec.*, 272 F. Supp. 3d 120, 124 (D.D.C. 2017). While the Forest Service raises thoughtful arguments as to why this case should be different, none holds up to scrutiny. The Court thus denies the Forest Service's Motion to Dismiss, ECF No. 8. An appropriate order will follow.

DATE: September 1, 2022

*[signature]*
CARL J. NICHOLS
United States District Judge

---

[9] Note that this will not open the door to a wave of frivolous suits against the government. Without a valid FOIA request, there cannot be any agency records improperly withheld from the complainant. Either way, assuming the strictures of Rule 11 are followed, such a failure will doom any frivolous case at the motion-to-dismiss stage.

17